DAVID L. ANDERSON (CABN 149604)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
SAVITH IYENGAR (CABN 268342)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-6748
    savith.iyengar@usdoj.gov

Attorneys for Plaintiff UNITED STATES
DEPARTMENT OF STATE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES DEPARTMENT OF STATE,<br><br>       Plaintiff,<br><br>  v.<br><br>BRUCE OWEN and ALEXANDRA OWEN,<br><br>       Defendants. | CASE NO. 4:19-cv-04094-HSG<br><br>**PLAINTIFF'S COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     October 15, 2020<br>Time:    2:00 p.m.<br>Place:   Courtroom 2, 4th Floor<br>Judge:  Hon. Haywood S. Gilliam, Jr. |

///

///

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ...........................................................................................1

RELIEF SOUGHT .........................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................2

I.      INTRODUCTION .................................................................................................................2

II.     SUMMARY OF ARGUMENT ............................................................................................2

III.    ISSUE TO BE DECIDED .....................................................................................................3

IV.     BACKGROUND ...................................................................................................................4

        A.      Federal Legal Framework: The Vienna Convention and Foreign Missions Act ...............4

        B.      Plaintiff's Lease to Defendant Bruce Owen .........................................................5

        C.      State and Local Statutory Framework .....................................................................6

        D.      Plaintiff's Withdrawal of the Property Under the Rent Control Ordinance .......................9

V.      LEGAL STANDARDS .......................................................................................................11

        A.      Summary Judgment Standard ................................................................................11

        B.      Standard to Withdraw Property from the Rental Market ....................................................12

VI.     ARGUMENT .......................................................................................................................13

        A.      Plaintiff Complied with the Applicable Rent Control Ordinance ......................................13

                1.      The Rent Control Ordinance as of July 23, 1987 Applied to the Property ............13

                2.      Plaintiff Was Authorized to Act for the Owner in Withdrawing the
                        Property from the Rental Market ..............................................................14

                3.      Plaintiff Complied with Each Provision of the Rent Control Ordinance ...............18

        B.      Plaintiff Had A Bona Fide Intent to Withdraw the Property from the Rental
                Market ................................................................................................20

                1.      Defendants Failed to Controvert Plaintiff's Bona Fide Intent ..............................21

                2.      The Record Contains No Evidence Disputing Plaintiff's Bona Fide Intent ...........21

        C.      Plaintiff Is Immune from An Injunction Requiring the Property to Remain on the
                Rental Market ....................................................................................................23

        D.      Plaintiff Is Entitled to Damages for Defendants' Unlawful Tenancy .................................23

VII.    CONCLUSION .....................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) ...................... 11

*Adler v. Elphick*, 184 Cal. App. 3d 642 (Cal. Ct. App. 1986) .................... 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................... 11, 13, 20

*Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152 (D.D.C. 2009) ....................... *passim*

*Bennett v. Islamic Republic of Iran*, 618 F.3d 19 (D.C. Cir. 2010) ..................... 4

*Celotex v. Catrett*, 477 U.S. 317 (1986) ..................... 11, 12, 13, 20

*CLD Constr., Inc. v. City of San Ramon*, 120 Cal. App. 4th 1141 (Cal. Ct. App. 2004) ..................... 17

*Drouet v. Superior Court*, 31 Cal. 4th 583 (Cal. 2003) ..................... *passim*

*Farmers & Merchants Nat. Bank of Los Angeles Cty. v. Superior Court of Los Angeles Cty.*,
   25 Cal. 2d 842 (Cal. 1945) ..................... 14, 15, 16

*Jackson v. Cty. of Amador*, 186 Cal. App. 4th 514 (Cal. Ct. App. 2010) ..................... 14, 16

*Jaimes v. Gonzales*, 223 F. App'x 715 (9th Cir. 2007) ..................... 17

*Jones v. Marks*, 47 Cal. 242 (1874) ..................... 14, 16

*Keenan v. Allan*, 91 F.3d 1275 (9th Cir. 1996) ..................... 11

*Knowles v. Robinson,* 60 Cal.2d 620 (Cal. 1963) ..................... 23

*Lane v. Pena*, 518 U.S. 187 (1996) ..................... 13

*Lehman v. Nakshian,* 453 U.S. 156 (1981) ..................... 14, 19

*Lehr v. Crosby*, 123 Cal. App. 3d Supp. 1 (Cal. Ct. App. 1981) ..................... 23

*Levin v. City & Cty. of San Francisco*, 71 F. Supp. 3d 1072 (N.D. Cal. 2014) ..................... 6

*Munguia-Brown v. Equity Residential*,
   No. C 16-01225 JSW, 2019 WL 3779523 (N.D. Cal. Aug. 12, 2019) ..................... 11, 12, 20

*Pac. Gas & Elec. Co. v. Hart High-Voltage Apparatus Repair & Testing Co.*,
   18 Cal. App. 5th 415 (Cal. Ct. App. 2017) ..................... 14, 15, 16

*Palestine Information Office v. Shultz*, 853 F.2d 932 (D.C. Cir. 1988) ..................... 5

*Reeves v. Shalala*, 185 F.3d 868 (9th Cir. 1999) ..................... 17

*Refvem v. Mirch*, No. C 98-3550 SI, 1999 WL 183621 (N.D. Cal. Mar. 31, 1999) ..................... 13

*San Francisco Apartment Assn. v. City & Cty. of San Francisco*,
   3 Cal. App. 5th 463 (Cal. Ct. App. 2016) ..................... 6, 8, 18

1  *Textile Workers v. Darlington Co.*, 380 U.S. 263 (1965) .......................................................... 12

2  *United States v. Chem. Found.*, 272 U.S. 1 (1926)...................................................... 14, 15, 16

3  *United States v. Nordic Village, Inc.*, 503 U.S. 30 (1992)........................................................ 13

4  *United States v. Trident Seafoods Corp.*, 92 F.3d 855 (9th Cir. 1996)..................................... 13

5                                              **STATUTES**

6  22 U.S.C. § 3903 ........................................................................................................................ 17

7  22 U.S.C. § 3904(1) .................................................................................................................... 17

8  22 U.S.C. § 4301 ..................................................................................................................... 4, 5

9  22 U.S.C. § 4303 ............................................................................................................. 5, 15, 16

10 22 U.S.C. § 4305(c) ........................................................................................................ 5, 15, 16

11 22 U.S.C. § 4308(f) .................................................................................................................... 23

12 Cal. Civ. Code § 1624(a)(3) (1985) ........................................................................................... 19

13 Cal. Civ. Code § 1954.51 ....................................................................................................... 7, 15

14 Cal. Gov't Code § 7060, *et seq.* ............................................................................................. 6, 18

15 S.F.A.C. § 37.9(a)(13) ........................................................................................................ *passim*

16 S.F.A.C. § 37.9A ................................................................................................................. *passim*

17                                                **RULES**

18 Fed. R. Civ. P. 56 ............................................................................................................... *passim*

19                                         **OTHER AUTHORITIES**

20 Executive Order 12170, 44 FR 65729 (November 12, 1979)............................................. *passim*

21 Vienna Convention on Consular Relations, 21 U.S.T. 77 (April 24, 1963) ...................... *passim*

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION

2       PLEASE TAKE NOTICE that on October 15, 2020 at 2:00 p.m. in Courtroom 2, located on the

3   4th Floor of 1301 Clay Street, Oakland, California, the Honorable Haywood S. Gilliam, Jr., presiding,

4   plaintiff United States Department of State ("Plaintiff") will move this Court for an order granting

5   summary judgment in its favor and against defendants Bruce and Alexandra Owen ("Defendants").  This

6   motion is made pursuant to Federal Rule of Civil Procedure 56 and the Court's orders dated August 18

7   and September 1, 2020, ECF Nos. 52 & 59, and is based on the ground that Plaintiff is entitled to

8   judgment as a matter of law as to the sole cause of action Plaintiff asserts in its complaint, for unlawful

9   detainer, ECF No. 1, because there is no factual dispute regarding Plaintiff's compliance with applicable

10  law in withdrawing the property at issue from the rental market.

11      The motion is based on this Notice, the following Memorandum of Points and Authorities, the

12  Declarations of Savith Iyengar ("Iyengar Decl.") and Matthew Sandelands ("Sandelands Decl.") and

13  Request for Judicial Notice ("RJN") filed herewith, all files and records in this matter, and any oral

14  argument and additional evidence that may be presented to the Court.

15

## RELIEF SOUGHT

16      Plaintiff seeks an order granting summary judgment in its favor as to the sole claim asserted in

17  the complaint, for unlawful detainer, declaring that Defendants' tenancy at the property at issue

18  terminated on June 19, 2019 with its withdrawal from the rental market, ejecting Defendants and anyone

19  residing with Defendants from the property, and finding that Plaintiff is entitled to damages for

20  Defendants' unlawful possession from June 19, 2019 until the date Plaintiff regains possession of the

21  property.

22      The only issue that may proceed to trial is the amount of damages Plaintiff is entitled to receive

23  from Defendants, which will be determined based on expert testimony regarding the reasonable rental

24  value of the property from June 19, 2019 until the date Plaintiff regains possession of the property,

25  subject to Plaintiff's anticipated *Daubert* challenges to Defendants' expert witnesses.

26

27  ///

28  ///

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiff seeks summary judgment on its sole cause of action in this case, for unlawful detainer. Plaintiff is the custodian of the former residence of the Iranian Consul General in San Francisco (the "Property").  Since the break in diplomatic relations with Iran in 1980, Plaintiff has had broad and sole authority over the Property, including the authority to rent it out, manage income derived from its rental, and sell it.  In 1987, Plaintiff leased the Property to defendant Bruce Owen and "agree[d] to abide by the rent control ordinance now in effect in San Francisco," *i.e.*, on July 23, 1987.  The rent control ordinance then in effect included provisions incorporating the state Ellis Act of 1985, which gives landlords an absolute right to withdraw a property from the residential rental market.  The relevant provisions of the rent control ordinance, added in 1986, set forth specific tenant payment and noticing requirements to withdraw a property from the rental market.

On June 19, 2019, after fully complying with these provisions, Plaintiff withdrew the Property from the rental market.  Defendants refused to vacate and, to date, remain in unlawful possession of the Property.  In their answer to Plaintiff's complaint and motion for summary judgment, Defendants assert several defenses, described below.  None of these defenses creates any factual dispute regarding the only issue this case presents: whether Plaintiff complied with the applicable rent control ordinance in withdrawing the Property from the rental market.  For these reasons and as set forth below, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment and grant Plaintiff's motion for summary judgment on its sole claim, for unlawful detainer.

## II.   SUMMARY OF ARGUMENT

Defendants have failed to create a factual dispute regarding Plaintiff's compliance with applicable law in withdrawing the Property from the rental market.  In their answer to the complaint and motion for summary judgment, Defendants assert the following defenses: (i) Plaintiff did not satisfy a notice provision added to the rent control ordinance in 2016 (ECF No. 55-1 ("DMSJ") at 8-11); (ii) Plaintiff is not the "owner" of the Property (ECF No. 16 ("Ans.") ¶ 44 (ninth affirmative defense); DMSJ at 5-8, 12-20); (iii) Plaintiff lacked "just cause" to evict them (Ans. ¶¶ 37, 40, 43, 56 (second, fifth, eighth and tenth affirmative defenses)); (iv) Plaintiff failed to comply with unwritten lease terms

1   (Ans. ¶¶ 39, 41 (fourth and sixth affirmative defenses)); (v) Plaintiff is "retaliating" against them for

2   seeking repairs (Ans. ¶¶ 36, 38 (first and third affirmative defenses)); and (vi) Defendants are entitled to

3   a setoff against "any award to [P]laintiff" (Ans. ¶ 42 (seventh affirmative defense)).

4           Each of these defenses fails as a matter of law.

5           First, Plaintiff agreed only to abide by the rent control ordinance in effect in San Francisco on

6   July 23, 1987.  *See infra* Part VI.A.1.  The notice provision added to the rent control ordinance in 2016

7   is inapplicable and barred by Plaintiff's sovereign immunity.  *Id.*  Second, Plaintiff is not required to be

8   the "owner" of the Property to withdraw it from the rental market.  Under California law, an authorized

9   agent may act for an owner "to execute instruments affecting title to real property," and this authority

10   expressly extends to federal custodians authorized by federal law to represent the property interests of a

11   foreign power, even absent specific authorization from that foreign power.  *See infra* Part VI.A.2.  This

12   is especially true where, as here, the federal custodian has broad and sole authority by executive order,

13   federal law and license, and international treaty to carry out "[a]ll transactions incident to" the

14   Property's "operation," including renting out the Property, collecting rental proceeds, and disposing of it

15   by sale.  *Id.*  Third, "just cause" is irrelevant where a landlord is withdrawing a property from the rental

16   market.  *See infra* Part VI.A.3.  Instead, a landlord is entitled to evict tenants where, as here, it has

17   complied with all applicable provisions of the rent control ordinance.  *Id.*  Fourth, the statute of frauds

18   bars unwritten lease terms; leases longer than one year must be in writing, and courts may ascertain the

19   intent of the parties "from the writing alone."  *Id.*  Fifth, retaliation is irrelevant because Defendants

20   have not disputed Plaintiff's bona fide intent to withdraw the Property from the rental market and not re-

21   rent it to any tenant in the future.  *See infra* Part VI.B.  Finally, Plaintiff is entitled to damages, as a

22   matter of law, for Defendants' unlawful detainer in the amount of the reasonable rental value of the

23   Property from June 19, 2019 until Plaintiff regains possession of the Property, and there is no basis for

24   any setoff from the amount Plaintiff is awarded.  *See infra* Part VI.C.

25   **III.    ISSUE TO BE DECIDED**

26           Whether Plaintiff is entitled to summary judgment on its sole claim against Defendants, for

27   unlawful detainer, because Defendants cannot show that there is a genuine issue for trial regarding

28   Plaintiff's compliance with the applicable San Francisco rent control ordinance.

## IV.     BACKGROUND

### A.        Federal Legal Framework: The Vienna Convention and Foreign Missions Act

The Property is the former residence of the Iranian Consul General in San Francisco, located at 3400 Washington Street.  ECF No. 1 ("Compl.") ¶¶ 3, 9; Ans. ¶¶ 3, 9.[1]  The Property is an 8,718 square-foot stucco and wood-frame single-family residence built in 1927 and purchased by the Government of Iran in 1969.  Compl. ¶ 9; Ans. ¶ 9.

The Property has been in Plaintiff's custody since the break in diplomatic relations with Iran in 1980.  Compl. ¶ 10; Ans. ¶ 10; *see also* Executive Order 12170, 44 FR 65729 (November 12, 1979) (blocking "all property and interests in property of the Government of Iran" in the United States).  At that time, the Property became subject to Article 27 of the Vienna Convention on Consular Relations ("Vienna Convention").  21 U.S.T. 77 (April 24, 1963).  Pursuant to Article 27, the parties to the Vienna Convention, including the United States and Iran, pledged that in cases where consular relations between two countries were severed, each country would "respect and protect the consular premises, together with the property of the consular post and the consular archives" of the other.  *Id.*, art. 27(1)(a).

In 1982, the Property became the responsibility of Plaintiff's Office of Foreign Missions ("OFM") with Congress's passage of the Foreign Missions Act.  Compl. ¶ 10; Ans. ¶ 10.  The Foreign Missions Act established OFM and formalized its authority over all foreign missions in the United States, including Iran's diplomatic properties.  *See* 22 U.S.C. § 4301, *et seq.*; *Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152, 164-65 (D.D.C. 2009), *aff'd*, 618 F.3d 19 (D.C. Cir. 2010).

In 1983, "the United States announced that it would rent out Iran's diplomatic properties periodically to generate income to pay for the upkeep required by the Vienna Convention."  *Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 22 (D.C. Cir. 2010).  OFM's decisions on behalf of the Department of State with respect to renting out Iran's diplomatic properties involve "an important foreign policy objective" of the United States: how the properties are to be protected under the Vienna Convention.  *Bennett*, 604 F. Supp. 2d at 166.  Accordingly, OFM's decision-making authority with respect to such properties is "broad."  *Id.* at 160 ("The Foreign Mission[s] Act, 22 U.S.C. §§ 4301, *et*

---

[1] Where Plaintiff cites both the complaint and answer, Defendants have admitted that fact.

*seq.,* vests the Department of State with broad authority to make determinations with respect to the treatment accorded to foreign missions here in the United States.") (citing *Palestine Information Office v. Shultz,* 853 F.2d 932, 936 (D.C. Cir. 1988)).  "The State Department 'acts at the apex of its power' when it exercises its authority over foreign missions here in the United States because 'it wields the combined power of both the executive and legislative branches.'"  *Id.* (quoting *Palestine,* 853 F.2d at 937 & citing 22 U.S.C. § 4301(c)); *see also id.* at 167 (explaining that this authority derives from the United States' "standing to uphold its foreign policy obligations under international agreements, particularly those relating to Iran.").

As the sole custodian of the Property by executive order, 44 FR 65729, Plaintiff possesses broad authority under federal law and license to carry out "[a]ll transactions incident to [its] preservation, renovation, and operation," Sandelands Decl. Exs. I, J,[2] including executing instruments affecting the title to the Property by renting it out, collecting rental proceeds, and disposing of it by sale.  22 U.S.C. § 4305(c); *see also* 22 U.S.C. § 4303(3), (5) (establishing the Secretary of State's authority "[a]s determined by the Secretary, [to] dispose of property acquired in carrying out the purposes of [the Foreign Missions Act]" and to "[p]erform other such functions as the Secretary may determine necessary in furtherance of the policy of [the Foreign Missions Act].").

## B.  Plaintiff's Lease to Defendant Bruce Owen

In 1984, OFM leased the Property to defendant Bruce Owen for a period of three years.  Compl. ¶ 11 & Ex. A; Ans. ¶ 11.  On July 23, 1987, OFM and Mr. Owen entered a new lease (the "1987 Lease") for a period of ten years, commencing August 1, 1987.  Compl. ¶ 12; Ans. ¶ 12; Sandelands Decl. ¶ 7, Ex. F (attaching 1987 Lease).  The 1987 Lease provided that "[t]he State Department agrees to abide by the rent control ordinance now in effect in San Francisco," *i.e.*, as of July 23, 1987.  Sandelands Decl., Ex. F.  The 1987 Lease entitled Mr. Owen to renew the lease at the end of the initial term for an additional ten years.  *Id.*; Compl. ¶ 12; Ans. ¶ 12.  In 1997, Mr. Owen renewed the lease for the additional ten years, which expired on July 31, 2007.  Compl. ¶¶ 13-14 & Ex. C; Ans. ¶¶ 13-14.  Defendants continued to reside at the property thereafter.  Compl. ¶ 5; Ans. ¶ 5.

---

[2] All exhibits to the Sandelands Declaration are subject to judicial notice, as set forth in Plaintiff's RJN filed herewith.

1     Pursuant to the 1987 Lease, "[a]ny holding over at the expiration of this lease shall create a

2     month to month tenancy," and "[a]ll other terms and conditions herein shall remain in full force and

3     effect," including Plaintiff's agreement to abide by the rent control ordinance in effect in San Francisco

4     as of July 23, 1987.  Sandelands Decl., Ex. F.

5     Defendants do not dispute these express terms.  In their verified interrogatory responses,

6     Defendants state that the rent control ordinance "that existed at the time the [lease] agreement was

7     formed" on July 23, 1987 governed the parties, and emphasize that "there is no provision in the lease to

8     allow for any future amendments" to that provision.  Iyengar Decl., Ex. A (Defs.' Verified Resp. to Pl.'s

9     Interrog. No. 1).  Defendants testified that any changes to the rent control ordinance after July 23, 1987

10    did not apply to the parties.  *Id.*, Ex. B ("B. Owen Tr.") 55:6-56:2; *id.*, Ex. C ("A. Owen Tr.") 147:1-6.

11    As Mr. Owen explained, the phrase "now in effect" meant only the rent control ordinance "now in effect

12    in San Francisco at the time we signed the lease.  Exactly what it says."  B. Owen Tr. 55:6-56:2.

13    The relevant provisions of the applicable rent control ordinance are set forth in Part IV.C, below.

14    **C.     State and Local Statutory Framework**

15    In 1985, the California legislature enacted the Ellis Act.  *See* Cal. Gov't Code §§ 7060-7060.7;

16    *Levin v. City & Cty. of San Francisco*, 71 F. Supp. 3d 1072, 1076 (N.D. Cal. 2014); Compl. ¶ 20; Ans.

17    ¶ 20.  The Ellis Act gives landlords an "absolute right to exit the residential rental business." *San*

18    *Francisco Apartment Assn. v. City & Cty. of San Francisco*, 3 Cal. App. 5th 463, 477 (Cal. Ct. App.

19    2016); Cal. Gov't Code § 7060(a) (prohibiting local governments from "compel[ling] the owner of any

20    residential real property to offer, or to continue to offer accommodations in the property for rent or

21    lease").  "The legislative history of the Act consistently demonstrates the purpose of the Act is to allow

22    landlords who comply with its terms to go out of the residential rental business by evicting their tenants

23    and withdrawing all units from the market[.]" *S.F. Apartment Assn.*, 3 Cal. App. 5th at 477; Cal. Gov't

24    Code § 7060(c) (stating that the legislative intent is to "permit landlords to go out of business").

25    On May 27, 1986, San Francisco's Board of Supervisors amended the San Francisco

26    Administrative Code to incorporate the Ellis Act into the rent control ordinance.  Sandelands Decl., Ex.

27    G (attaching Ord. No. 193-86); *see also* Compl. ¶ 21; Ans. ¶ 21.  The amendment added two sections to

28    the San Francisco Administrative Code, effective June 29, 1986: Section 37.9(a)(13) and Section 37.9A.

Sandelands Decl., Ex. G.

Section 37.9(a)(13) allows a "landlord . . . to recover possession of a rental unit" if "[t]he landlord . . . wishes to withdraw from rent or lease all rental units within any detached physical structure . . . and complies in full with Section 37.9A with respect to each such unit[.]" *Id.* at 9.  Section 37.2(h) defines "landlord" as "[a]n owner, lessor, sublessor, who receives or is entitled to receive rent for the use and occupancy of any residential rental unit or portion thereof in the City and County of San Francisco, and the agent, representative or successor of any of the foregoing." *Id.* at 3.  The ordinance does not define "owner." *See generally id.*[3]

Section 37.9A establishes rent limits for withdrawn units, re-rental rights for displaced tenants, and, relevant here, requirements that landlords or owners (used interchangeably) make payments and provide specific notices in order to withdraw a property from the rental market. *Id.* at 11-20.

Subsections (a) and (b) of Section 37.9A establish rent limits for withdrawn units.  Under subsection (a), if a landlord offers a withdrawn unit for rent or lease, the rent is limited to the amount that would have applied if the unit had remained in continuous occupancy.  Under subsection (b), if the withdrawn unit is demolished and a new unit is constructed and offered for rent or lease, the rent is limited to an amount reasonably calculated to produce a fair and reasonable return on the new unit. *Id.* at 11-12.  Subsections (c), (d) and (e) establish displaced tenants' re-rental rights. *Id.* at 12-15.  Under subsection (c), if an owner offers a withdrawn unit covered by subsection (a) for rent or lease, it must first offer the unit for rent or lease to the displaced tenant. *Id.* at 12-13.  Subsection (d) establishes procedures for a tenant to accept a re-rental offer, and subsection (e) provides for damages if a withdrawn unit is offered for rent or lease within one year after it became vacant. *Id.* at 13-15.

As noted above, subsections (f) and (g) are relevant here, as they set forth the requirements to withdraw a property from the rental market: remitting a specified payment to the tenants, and providing specified notices to the tenants, the Rent Board, and the County Recorder.

Subsection (f)(1) requires landlords to pay tenants the following sums: $1,500 for a one- or two-

---

[3] The later-enacted Costa-Hawkins Rental Housing Act of 1995, however, defines "owner" as "any person, acting as principal or through an agent, having the right to offer residential real property for rent." Cal. Civ. Code § 1954.51.

1  room unit, $1,750 for a three-room unit, $2,500 for a unit with two or more separate bedrooms, and,

2  "notwithstanding the above, irrespective of the size of the unit," $3,000 "if any tenant resides in the unit

3  who is 62 or older at the time notice is served," or is disabled.  *Id.* at 15-16.  Subsection (f)(2) provides

4  that where a unit was occupied by more than one tenant, the payment due "shall be divided equally

5  among all the occupying tenants."  *Id.* at 16.

6       Subsections (f)(3) and (g) set forth the notice requirements to the tenant, Rent Board, and County

7  Recorder.  Subsection (f)(3) requires that "[a]ny notice to quit pursuant to Section 37.9(a)(13) shall

8  notify the tenant or tenants concerned of the right to receive payment under this subsection and the

9  amount of payment which the landlord believes to be due."  *Id.*  Subsection (g)(1) requires that "[a]ny

10 owner who intends to withdraw from rent or lease any rental unit shall notify the [Rent] Board in writing

11 of said intention," as follows:

12       Said notice shall contain statements, under penalty of perjury, providing information on
        the number of residential units, the address or location of those units, the name or names
13       of the tenants or lessees of the units, and the rent applicable to each residential rental unit.
        Said notice shall include a certification under penalty of perjury that actions have been filed
14       as required by law to terminate all existing tenancies in the structure in question.

15 *Id.* at 16-17.  Subsection (g)(2) requires the owner to "cause to be recorded with the County Recorder a

16 memorandum of the notice required by subsection (1) summarizing its provisions . . . in substantially the

17 following form:"

18                                   Memorandum of Notice
                          Regarding Withdrawal of Rental Unit From Rent or Lease
19
20       This memorandum evidences that the undersigned, as the owner or on behalf of the owner,
        of the property described in Exhibit A attached, has filed a notice, whose contents are
21       certified under penalty of perjury, stating the intent to withdraw from rent or lease all units
        subject to existing tenancies at said property, pursuant to San Francisco Administrative
22       Code Section 37.9A(f).

23 *Id.* at 17.  Subsection (g)(3) provides that "[w]here an owner satisfies the requirements of subsections

24 (g)(1) and (g)(2), the date on which the units are withdrawn from rent or lease for purposes of this

25 chapter is 60 days from the delivery in person or by first-class mail of the notice to the public entity."

26 *Id.*

27       Subsection (g)(4) requires the owner to notify the displaced tenant "that the City has been

28 notified pursuant to subsection (g)(1), that the notice specified the name and the amount of rent paid by

the tenant or lessee as an occupant of the rental unit, and of the amount of rent the owner specified in the notice, together with a notice to the tenant or lessee of his or her rights under subsection (g)(1) of this section." *Id.* at 18.

The remaining subsections govern a property after its withdrawal from the rental market. Subsection (g)(5) requires the owner to "notify the [Rent] Board in writing of any intention to again offer for rent or lease any" withdrawn rental unit. *Id.* Subsection (h) applies Section 37.9A to any successor in interest of an owner, and subsection (i) requires the owner to submit periodic reports to the Rent Board starting after a tenant vacates pursuant to Section 37.9(a)(13). *Id.* at 18-19.

### D. Plaintiff's Withdrawal of the Property Under the Rent Control Ordinance

In 2018, OFM decided to withdraw the Property from the rental market and prepare it for long term storage. OFM thereafter followed each of the relevant requirements of Sections 37.9(a)(13) and 37.9A to withdraw the Property from the rental market, *i.e.*, by remitting payment to Defendants and providing the specified notices to Defendants, the Rent Board, and the County Recorder.

Pursuant to Sections 37.9A(f)(1) and (f)(2), on June 19, 2018, OFM sent relocation assistance payments to Defendants. Compl. ¶ 25; Ans. ¶ 25.[4] The payments were enclosed with Plaintiff's Notice of Termination of Tenancy ("Notice of Termination") to Defendants. Compl. ¶¶ 25; Ans. ¶¶ 25; Sandelands Decl. ¶ 2 & Ex. A (Notice of Termination).[5]

Pursuant to subsection (f)(3), the Notice of Termination also notified Defendants of their "right to receive payment under this subsection and the amount of payment which the landlord believes to be due." Compl. ¶¶ 23-24; Ans. ¶¶ 23-24; Sandelands Decl., Ex. A.[6]

Pursuant to subsection (g)(1), on June 19, 2018, OFM filed with the Rent Board a Notice of

---

[4] OFM paid each Defendant relocation assistance in an increased amount of $5,526.99 pursuant to an adjustment in 2005. Compl. ¶¶ 24, 25; Ans. ¶¶ 24, 25; *see also* Sandelands Decl. ¶ 9 (explaining that where an amendment increased an amount set forth in the applicable ordinance, OFM provided that increased amount in an abundance of caution).

[5] Defendants have conceded that "there is no dispute as to what notices were served and recorded and when that was done." DMSJ at 9.

[6] Plaintiff also included this language in its Notice Regarding Termination of Tenancy ("Notice of Filing"), served on June 19, 2018, and Three-Day Notice to Quit ("Notice to Quit"), served on June 19, 2019. Compl. ¶¶ 23-30; Ans. ¶¶ 23-30; Sandelands Decl., Exs. D (Notice of Filing) & E (Notice to Quit).

Intent to Withdraw Residential Units from the Rental Market ("Notice of Intent"), thereby notifying the Rent Board in writing of OFM's intent to withdraw the Property from the rental market.  Compl. ¶ 23; Ans. ¶ 23; Sandelands Decl., Ex. B.  The Notice of Intent provided all of the information required by subsection (g)(1), including the number of residential units at the Property (one), the Property's address, the name of the tenants or lessees of the Property, and the rent applicable to the Property.  Sandelands Decl., Ex. B.  The Notice of Intent also certified that actions were filed as required to terminate all existing tenancies at the Property, *i.e.*, by service of the Notice of Termination.  *Id.*

Pursuant to subsection (g)(2), on June 19, 2018, OFM recorded a Memorandum of Notice Regarding Withdrawal of Rental Units from Rent or Lease with the San Francisco County Assessor-Recorder ("Memorandum of Notice"), summarizing the notice required by subsection (g)(1) (the Notice of Intent) in substantially the form set forth in subsection (g)(2).  Compl. ¶ 26; Ans. ¶ 26; Sandelands Decl., Exs. C & G at 17.  The Memorandum of Notice affirmed that OFM "has filed a notice with the San Francisco Residential Rent Stabilization and Arbitration Board, which contents are certified under penalty of perjury, stating the intent to withdraw from rent or lease all units at said property, pursuant to San Francisco Administrative Code Section 37.9A and the Ellis Act."  Sandelands Decl., Ex. G at 17.

Pursuant to subsection (g)(3), the Notice of Termination informed Defendants that their tenancy at the Property would be terminated as of the date 120 days after the Notice of Intent was filed with the Rent Board.  Compl. ¶ 23; Ans. ¶ 23; *see also* Sandelands Decl. ¶ 9 & Exs. A & B.

Pursuant to subsection (g)(4), on June 19, 2018, OFM notified Defendants by the Notice of Filing that the Rent Board had been notified of the Property's withdrawal from the rental market (by the Notice of Intent); that the Notice of Intent specified Defendants' names, the amount of rent they paid, and the amount specified in the Notice of Intent; and that Defendants had certain rights in connection with the Property's withdrawal from the rental market. Compl. ¶ 23; Ans. ¶ 23; Sandelands Decl., Ex. D.

On August 7, 2018, Defendants, through their counsel, acknowledged receipt of the relocation assistance payments and requested an extension of the date of withdrawal of one year from the date the Notice of Intent was filed.  Compl. ¶ 27; Ans. ¶ 27.  OFM did not dispute the extension to June 19, 2019.  Compl. ¶ 28; Ans. ¶ 28; Sandelands Decl. ¶ 9.

In early June 2019, Plaintiff's counsel reached out to Defendants' counsel to see if Defendants intended to vacate the Property by June 19, 2019, and was informed that Defendants did not intend to vacate the Property by that date.  Compl. ¶ 29; Ans. ¶ 29.  On June 19, 2019, Plaintiff served Defendants with the Notice to Quit, which informed Defendants that "effective June 19, 2019," the Property had been withdrawn from the rental market and Defendants' month-to-month tenancy had been terminated. Compl. ¶ 30; Ans. ¶ 30; Sandelands Decl., Ex. E.  The Notice to Quit demanded that Defendants quit the Property, move out, and deliver possession to OFM within three days of service of the Notice to Quit. Compl. ¶ 31; Ans. ¶ 31; Sandelands Decl., Ex. E.  Defendants did not quit the property, move out, or deliver possession to OFM, and remain in possession of the Property.  Compl. ¶¶ 5, 32; Ans. ¶¶ 5, 32. Accordingly, on July 17, 2019, Plaintiff filed this action seeking possession of the Property and damages for each day that Defendants have remained in possession from the date of withdrawal on June 19, 2019 until Plaintiff regains possession.  Compl. at 6.

## V.   LEGAL STANDARDS

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986).  An issue is "material" if the fact may affect the outcome of the case.  *Id.* at 249.

"The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact."  *Munguia-Brown v. Equity Residential*, No. C 16-01225 JSW, 2019 WL 3779523, at *2 (N.D. Cal. Aug. 12, 2019) (citing *Celotex v. Catrett*, 477 U.S. 317, 323 (1986) & Fed. R. Civ. P. 56(c)).  The burden then shifts to the non-moving party to "go beyond the pleadings and, by its own evidence, 'set forth specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting *Anderson*, 477 U.S. at 250).  The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  "If the non-moving party

1   fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a

2   matter of law." *Munguia-Brown*, 2019 WL 3779523, at *2 (citing *Celotex*, 477 U.S. at 323 & Fed. R.

3   Civ. P. 56(e)(3)).

4   **B.      Standard to Withdraw Property from the Rental Market**

5       Section 37.9(a)(13) of the applicable San Francisco rent control ordinance permits a

6   "landlord . . . [who] wishes to withdraw from rent or lease all rental units" at a property to evict its

7   tenants where it "complies in full with Section 37.9A[.]"  Sandelands Decl., Ex. G at 9.  Because a

8   landlord has an absolute right to go out of business, a landlord's other motivations are irrelevant.

9   *Drouet v. Superior Court*, 31 Cal. 4th 583, 597 (Cal. 2003) (rejecting tenants' defenses that the landlord

10  "illegally attempted to raise the rent, overcharged for utilities, refused to pay interest on security

11  deposits, [ ] violated the lease," failed to "make [ ] requested repairs," and retaliated against them for

12  complaining about conditions at the property).  The California legislature "has made it clear that a

13  landlord who seeks to withdraw rental property under the Ellis Act has no obligation to maintain the

14  tenantability or habitability of the premises." *Id.* at 599.  The Ellis Act prohibits tenants from "forc[ing]

15  the landlord to remain in business indefinitely." *Id.*  Instead, a landlord's right to withdraw property is

16  analogous to an employer's "absolute right, at all times, to permanently close and go out of business . . .

17  for whatever reason he may choose, whether union animosity or anything else." *Id.* at 596-97 (quoting

18  *Textile Workers v. Darlington Co.*, 380 U.S. 263, 271 (1965)).

19      Accordingly, a landlord with a "bona fide intent" to withdraw a property from the rental market

20  has an absolute right to "evict the tenants—even if the landlord has a retaliatory motive[.]" *Id.* at 597.

21  A tenant's only cognizable defense to an Ellis Act eviction is to prove, with evidence, that the landlord

22  actually did not have a bona fide intent to withdraw the property from the rental market.  "[A] tenant

23  who believes the landlord's invocation of the [Ellis] Act is phony and that the landlord actually intends

24  to offer the vacated units to new tenants may controvert the landlord's statement of intent." *Id.*  If the

25  tenant does so, then the landlord has "the burden to establish his or her bona fide intent to withdraw the

26  property from the market by a preponderance of the evidence." *Id.*  Accordingly, in moving for

27  summary judgment, a landlord may identify those portions of the record that demonstrate either the

28  tenant's failure to controvert the landlord's stated intent, or the absence of a genuine issue of material

1  fact regarding the landlord's intent. *Munguia-Brown*, 2019 WL 3779523, at *2. In opposition, the

2  tenant must "go beyond the pleadings and, by its own evidence, 'set for the specific facts showing that

3  there is a genuine issue for trial'" regarding the landlord's intent to withdraw the property from the

4  market. *Id.* (quoting *Anderson*, 477 U.S. at 250). If the tenant "fails to point to evidence precluding

5  summary judgment," then the landlord "is entitled to judgment as a matter of law." *Id.* (citing *Celotex*,

6  477 U.S. at 323 & Fed. R. Civ. P. 56(e)(3)).

7  **VI.  ARGUMENT**

8      **A.  Plaintiff Complied with the Applicable Rent Control Ordinance**

9          **1.  The Rent Control Ordinance as of July 23, 1987 Applied to the Property**

10      There is no genuine dispute that the only rent control ordinance provisions that applied to

11  Plaintiff were those in effect on July 23, 1987. The 1987 Lease expressly provided that "[t]he State

12  Department agrees to abide by the rent control ordinance now in effect in San Francisco," *i.e.*, as of July

13  23, 1987. Sandelands Decl., Ex. F. The 1987 Lease provided further that at its expiration, this term

14  "shall remain in full force and effect." *Id.* Indeed, Defendants have conceded this plain reading of the

15  1987 Lease. *See* Iyengar Decl., Ex. A (Defs.' Verified Resp. to Pl.'s Interrog. No. 1) (stating that the

16  rent control ordinance "that existed at the time the [lease] agreement was formed" in 1987 continued to

17  apply thereafter); B. Owen Tr. 55:6-56:2 (testifying that any changes to the rent control ordinance after

18  July 23, 1987 did not apply to the parties); A. Owen 147:1-6 (same); B. Owen Tr. 55:6-56:2 (testifying

19  that the phrase "now in effect" meant "[e]xactly what it says": the rent control ordinance "now in effect

20  in San Francisco at the time we signed the lease" on July 23, 1987).

21      Sovereign immunity also precludes any dispute as to this issue. To the extent Plaintiff waived

22  sovereign immunity, it did so only as to the rent control ordinance in effect on July 23, 1987, and its

23  waiver must be construed "strictly," "narrowly," and "in favor of the sovereign." *Lane v. Pena*, 518

24  U.S. 187, 192, 195 (1996) ("When confronted with a purported waiver of the Federal Government's

25  sovereign immunity, the Court will 'constru[e] ambiguities in favor of immunity."); *United States v.*

26  *Trident Seafoods Corp.*, 92 F.3d 855, 864 (9th Cir. 1996) ("Waivers of immunity must be strictly

27  construed in favor of the sovereign."); *Refvem v. Mirch*, No. C 98-3550 SI, 1999 WL 183621, at *2

28  (N.D. Cal. Mar. 31, 1999) ("Waivers of sovereign immunity are narrow and must be strictly construed in

favor of the sovereign.") (citing *United States v. Nordic Village, Inc.,* 503 U.S. 30, 34, (1992)).  Here, any waiver of sovereign immunity by Plaintiff applied only to those provisions of the rent control ordinance in effect on July 23, 1987 — not to future provisions or amendments by San Francisco thereafter.  *See Lehman v. Nakshian,* 453 U.S. 156, 161 (1981) ("[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.").

### 2. Plaintiff Was Authorized to Act for the Owner in Withdrawing the Property from the Rental Market

There is likewise no genuine dispute that Plaintiff, as the federal custodian of the Property, is authorized by executive order, federal law and license, and international treaty to act for the Government of Iran with respect to the Property, including in withdrawing the Property from the rental market.  It is black-letter law in California that where an "owner" must act with respect to real property, an authorized agent, too, may act for the owner — including "to execute instruments affecting title to real property." *Jackson v. Cty. of Amador*, 186 Cal. App. 4th 514, 519 (Cal. Ct. App. 2010) (citing *Jones v. Marks*, 47 Cal. 242, 246-48 (1874)).  This authority expressly extends to federal custodians who are authorized by federal law to represent the property interests of a foreign power, even absent specific authorization from that foreign power.  *See, e.g.*, *Farmers & Merchants Nat. Bank of Los Angeles Cty. v. Superior Court of Los Angeles Cty.*, 25 Cal. 2d 842, 847 (Cal. 1945) (explaining that the federal custodian possessed "broad powers" by federal statute with respect to such property interests) (citing *United States v. Chem. Found.*, 272 U.S. 1, 9 (1926) (holding that federal statute authorized the federal custodian to consummate the sale of foreign property)); *see also Pac. Gas & Elec. Co. v. Hart High-Voltage Apparatus Repair & Testing Co.*, 18 Cal. App. 5th 415, 427-28 (Cal. Ct. App. 2017) (explaining that an owner is "*a person in whom one or more interests are vested*," and that in considering whether authority exists to act for an owner, courts consider the specific property interests affected) (emphasis in original).

These principles are consistent with the applicable rent control ordinance, which defines "landlord" as "[a]n owner, lessor, sublessor, who receives or is entitled to receive rent for the use and occupancy of" the property, "*and the agent, representative or successor of any of the foregoing*," Sandelands Decl., Ex. G at 3 (emphasis added), and permits a "*landlord . . . [who] wishes to withdraw*

1   from rent or lease all rental units" at a property to evict its tenants where the landlord "complies in full

2   with Section 37.9A with respect to each such unit," *id.* at 9.  Further, where the ordinance requires the

3   "owner" to record a notice with the County Recorder, it makes clear that the notice may be executed and

4   filed by "the owner *or on behalf of the owner*."  Sandelands Decl., Ex. G at 17 (emphasis added).[7]

5          Here, as the federal custodian of the Property, Plaintiff is authorized by executive order, federal

6   law and license, and international treaty to act for the Government of Iran in executing instruments

7   affecting title to the Property.  Plaintiff possesses sole authority over the Property pursuant to Executive

8   Order 12170, which "blocked all property and interests in property of the Government of Iran" in the

9   United States.  44 FR 65729.  Plaintiff is broadly authorized by federal statutes to affect title to the

10  Property, including by renting it out, disposing of it by sale, and "[p]erform[ing] other such functions as

11  the Secretary may determine necessary in furtherance of the policy of [the Foreign Missions Act]."  22

12  U.S.C. §§ 4303(3), (5) & 4305(c).  Plaintiff is also expressly authorized by federal license to carry out

13  "[a]ll transactions incident to the preservation, renovation, and operation of" the Property.  Sandelands

14  Decl., Exs. I & J.  In sum, Plaintiff is authorized to act for the Government of Iran in withdrawing the

15  Property from the rental market based on its broad and sole authority as the Property's federal custodian.

16  *See Chem. Found.*, 272 U.S. at 9; *Farmers*, 25 Cal. 2d at 847; *Pac. Gas*, 18 Cal. App. 5th at 427-28.

17         Defendants assert in their answer to the complaint and motion for summary judgment that

18  Plaintiff did not comply with the rent control ordinance for the following reasons: Plaintiff is not the

19  "owner" of the Property (Ans. ¶ 44 (ninth affirmative defense); DMSJ at 12-20); Plaintiff submitted

20  "false declarations" by signing the required notices (*id.* at 5-8); and Mr. Sandelands lacked authority to

21  sign documents on behalf of OFM (*id.* at 19-20).  Each of these arguments fails as a matter of law.

22         First, Defendants argue that the Ellis Act and "[a]ll of the local ordinances . . . require that only

23  an 'owner' can serve the notices or fill out the forms," and that "[n]o one" claims that Plaintiff "is an

24  'owner' of [the Property] or that it is acting on behalf of an owner."  DMSJ at 15.  Defendants misstate

25  Mr. Sandelands's testimony and misunderstand Plaintiff's legal authority as custodian of the Property,

26

27         [7] As noted in Part IV.C, above, this is consistent with the later-enacted Costa-Hawkins Rental
28  Housing Act of 1995, which defines "owner" as "any person, acting as principal or through an agent,
    having the right to offer residential real property for rent."  Cal. Civ. Code § 1954.51.

described above.  With respect to Mr. Sandelands's testimony, Defendants claim the "gist" is that Plaintiff cannot act for the Government of Iran with respect to the Property.  *Id.* at 17.  In fact, Mr. Sandelands testified that OFM's "purpose is to uphold our treaty obligations in the Vienna Convention on Diplomatic Relations, Consular Relations, and the Foreign Mission[s] Act," Iyengar Decl., Ex. D ("Sandelands Tr.") 10:13-16, and that "we were the custodian for the [G]overnment of Iran" in withdrawing the Property from the rental market.  *Id.* 46:7-8; *Bennett*, 604 F. Supp. 2d at 168 (emphasizing the important distinction between "appearing . . . in order to defend the Islamic Republic or Iran, as counsel's rhetoric tends to suggest," and "seek[ing] to uphold [the United States'] obligations under multi-national treaties in furtherance of broader foreign policy objectives.").

As custodian of the Property for the Government of Iran, Plaintiff is entitled, as a matter of law, to execute instruments affecting title to the Property, including withdrawing it from the rental market.  Contrary to Defendants' claim that "there is not a single" relevant case, DMSJ at 16, as explained above, California law recognizes that an authorized agent may act for an owner in "execut[ing] instruments affecting title" to real property.  *Jackson*, 186 Cal. App. 4th at 519 (citing *Jones*, 47 Cal. at 246-48).  Federal and state law likewise hold that a federal custodian may be authorized by federal law to represent the property interests of a foreign power, even absent specific authorization from that foreign power.  *See Farmers*, 25 Cal. 2d at 847 (citing *Chem. Found.*, 272 U.S. at 9 (1926)); *Pac. Gas*, 18 Cal. App. 5th at 427-28.  Consistent with these principles, Plaintiff was expressly authorized by executive order, federal law and license, and international treaty to act as the sole custodian of the Property for the Government of Iran.  44 FR 65729; 22 U.S.C. §§ 4303(3), (5) & 4305(c); Sandelands Decl., Exs. I & J.  This broad authority to act for the Government of Iran extends to "[a]ll transactions incident to the . . . operation of" the Property, including renting it out, selling the Property, or withdrawing it from the rental market.  Sandelands Decl., Exs. I & J; 22 U.S.C. §§ 4303(3), (5) & 4305(c).

Defendants next argue that by signing two notices regarding the Property's withdrawal from the rental market, Plaintiff submitted "false declarations."  DMSJ at 5-8.  Defendants assert that Plaintiff could not sign the Memorandum of Notice because it states on its face that "the form had 'to be recorded by owner.'"  *Id.* at 9.  Defendants are mistaken for the reasons set forth above: Plaintiff possesses broad

1   and sole authority as custodian of the Property to act for the Government of Iran, and this authority

2   includes executing instruments affecting the Property's title.  In any event, as discussed in Part VI.A.3,

3   below, Defendants cite only the inapplicable *current* rent control ordinance.  Section 37.9A(g)(2) of the

4   applicable ordinance requires that the memorandum of notice be executed and filed with the County

5   Recorder by "the owner *or on behalf of the owner*."  Sandelands Decl., Ex. G at 17 (emphasis added).

6          Defendants also argue that the Notice of Intent is a "false declaration" because it states, on its

7   face, that "each 'owner of record' must sign" and that "[a]ttorneys and/or non-attorney representatives

8   may not sign the owner's declaration on behalf of an owner."  DMSJ at 10.  Defendants appear to

9   believe that Plaintiff is a "non-attorney representative."  *Id.*  In fact, a "non-attorney representative" is a

10  non-attorney hired to assist a party with court proceedings.  *See, e.g.*, *Jaimes v. Gonzales*, 223 F. App'x

11  715, 716 (9th Cir. 2007); *Reeves v. Shalala*, 185 F.3d 868 (9th Cir. 1999); *CLD Constr., Inc. v. City of*

12  *San Ramon*, 120 Cal. App. 4th 1141, 1148 n.4 (Cal. Ct. App. 2004).  OFM is not a "non-attorney

13  representative"; it is the federally-authorized custodian of the Property for the Government of Iran.

14         Finally, Defendants argue that "Mr. Sandelands is not the person with authority to make the

15  decision" to withdraw the Property and was "not qualified to sign on behalf of the United States."

16  DMSJ at 23.  Defendants cite no facts or law in support of this defense.  In fact, as a Foreign Service

17  Officer, Mr. Sandelands possessed delegated authority to act for OFM pursuant to the Foreign Service

18  Act.  Section 103 of the Foreign Service Act authorized Mr. Sandelands to "carry[ ] out the functions of

19  the Service."  22 U.S.C. § 3903.  Section 104 set forth these functions, which include "represent[ing] the

20  interest of the United States in relation to foreign countries and international organizations, and

21  perform[ing] the functions relevant to their appointments and assignments, including (as appropriate)

22  functions under the Vienna Convention on Diplomatic Relations, the Vienna Convention on Consular

23  Relations, other international agreements to which the United States is a party, the laws of the United

24  States, and orders, regulations, and directives issued pursuant to law."  22 U.S.C. § 3904(1).  The

25  Secretary of State delegated authority to OFM Acting Director Cliff Seagroves to represent the interests

26  of the United States, and Mr. Seagroves authorized the withdrawal of the Property from the rental

27  market and authorized Mr. Sandelands to implement that decision on behalf of OFM.  Sandelands Decl.

28  ¶ 10 & Ex. H.

### 3.   Plaintiff Complied with Each Provision of the Rent Control Ordinance

As explained in Part IV.D, above, Plaintiff satisfied each provision of the applicable rent control ordinance in withdrawing the Property from the rental market.  Defendants concede that "there is no dispute as to what notices were served and recorded and when that was done."  DMSJ at 9.  These notices reflect OFM's full compliance with the rent control ordinance, as follows: OFM enclosed relocation assistance payments to Defendants with the Notice of Termination (in accordance with Sections 37.9A(f)(1) and (f)(2)); OFM notified Defendants of their "right to receive payment under this subsection and the amount of payment which the landlord believes to be due" in the Notice of Termination, Notice of Filing, and Notice to Quit (subsection (f)(3)); OFM notified the Rent Board in writing of its intention to withdraw the Property from the rental market with the Notice of Intent, which provided all of the information and certification required by the provision (subsection (g)(1)); OFM notified the County Recorder of the Notice of Intent by recording the Memorandum of Notice, which summarized all required information and affirmed that OFM filed the Notice of Intent with the Rent Board (subsection (g)(2)); OFM notified Defendants with the Notice of Termination that their tenancy would be terminated based on the filing of the Notice of Intent (subsection (g)(3)); and OFM notified Defendants that the Notice of Intent had been filed, specified the contents of the Notice of Intent, and stated Defendants' rights in connection with the Property's withdrawal from the rental market (subsection (g)(4)).  *See supra* Part IV.D.

None of Defendants' affirmative defenses or arguments in their motion for summary judgment creates any genuine dispute as to Plaintiff's compliance with these provisions.  Defendants first assert, as affirmative defenses, that Plaintiff lacked "just cause" to evict them.  Ans. ¶¶ 37, 40, 43, 56 (second, fifth, eighth and tenth affirmative defenses).  As discussed in Part V.B, above, "just cause" is irrelevant in an eviction under Section 37.9(a)(13).  The Ellis Act and Section 37.9(a)(13) give landlords an "absolute right to exit the residential rental business" and evict tenants on that basis.  *S.F. Apartment Assn.*, 3 Cal. App. 5th at 477; Cal. Gov't Code § 7060(a).  The only relevant consideration is the landlord's bona fide intent to withdraw the property from the rental market.  *Drouet*, 31 Cal. 4th at 597.

Defendants next assert, as affirmative defenses, that Plaintiff failed to comply with unwritten lease terms.  Ans. ¶¶ 39, 41 (fourth and sixth affirmative defenses).  Ms. Owen testified that "before we

signed the lease" on July 23, 1987, someone from the United States told Defendants:

> We would like you to stay. We think you are great tenants. How about if we go by the San Francisco Rent Control Board. The only reason we would evict you is to give it back to the Iranians, if they wanted it back, which we doubt they would, even if the nation is normalized. So you could consider yourself here forever.

A. Owen Tr. 146:12-25. Mr. Owen likewise testified that when he signed the lease, "Ambassador Massey" made the following statements:

> Well, Ambassador Massey said, "We love the fact that you are moving into the property, and we want you here forever, as long as we can control the property. And we intend to sell you the property within five years. We have to clear out -- you know, do some work within the department, but we want you here, which is why we are going to give you a right of first refusal to buy it. And we welcome you with open arms. And we are going to do anything in the world to make -- be a good landlord for you. We love your tenancy."

B. Owen Tr. 63:12-21. All of these assertions are barred by the statute of frauds, which requires lease agreements for a period longer than one year to be in writing. Cal. Civ. Code § 1624(a)(3) (1985) (amended 1998). The intention of parties with respect to such agreements "is to be ascertained from the writing alone." *Id.* § 1639 (1872). Further, principles of sovereign immunity explained in Part VI.A.1, above, require that the express provisions of the 1987 Lease be "strictly observed and [that] exceptions thereto are not to be implied." *Lehman,* 453 U.S. at 161. Any supposedly unwritten lease terms are therefore barred and cannot create a genuine issue of material fact regarding Plaintiff's compliance with the 1987 Lease.

Finally, Defendants argue in their motion for summary judgment that Plaintiff did not satisfy a notice provision that was added to the rent control ordinance in 2016. DMSJ at 8-11 (citing new Section 37.9(c)); *id.* at 13 (stating that this "requirement was specifically added to the SFRO in 2016"). As explained in Part VI.A.1, above, this provision does not apply to Plaintiff because it was not "in effect" at the time the parties signed the 1987 Lease. In any event, even if this additional notice provision had applied — which it did not — any failure to provide would not be material. Defendants' testimony makes clear that they did not need this new notice, which tells tenants they must timely respond to a landlord's notice to terminate tenancy, may receive advice from the Rent Board, and may be eligible for affordable housing programs and apartments. Here, Defendants were represented by their long-term real estate counsel Andrew M. Zacks when they received Plaintiff's notices on June 19, 2018, and Mr. Zacks

1   timely responded to the notice.  Compl. ¶ 27; Ans. ¶ 27.  As Ms. Owen testified, Mr. Zacks was a "good

2   real estate lawyer" with experience in landlord-tenant law.  A. Owen Tr. 124:2-125:6.  Both Defendants

3   testified that Mr. Zacks was their long-term counsel.  *Id.* 125:7-19; B. Owen Tr. 39:5-8.  Ms. Owen

4   testified that Mr. Zacks had represented them for "[y]ears," possibly more than ten years.  A. Owen Tr.

5   125:7-19.  Ms. Owen also testified about Defendants' experience as landlords, having purchased five

6   residential properties over the years, *id.* 80:8-25, 87:18-25, renting out four of the properties to tenants

7   before ultimately selling them, *id.* 86:14-18, 88:3-6, and currently renting out one two-unit property they

8   own at 982 Green Street in San Francisco to tenants, *id.* 80:8-25, 84:17-25.  Ms. Owen also testified that

9   she "probably" knew she could contact the Rent Board, but had "no reason to," *id.* 127:8-128:1, and Mr.

10  Owen testified that he actually did contact the Rent Board and received information and documents, B.

11  Owen Tr. 39:16-23.  With respect to affordable housing, Mr. Owen testified that Defendants had no

12  interest in affordable housing and that he did not research affordable housing options because he "didn't

13  grow up out in the projects."  *Id.* 41:17-42:13.  Accordingly, while the new notice provision added in

14  2016 did not apply to Plaintiff, any failure to provide it would not, in any event, create any genuine issue

15  of material fact.

16         **B.     Plaintiff Had A Bona Fide Intent to Withdraw the Property from the Rental Market**

17         As discussed in Part V.B, above, once a landlord establishes its compliance with the rent control

18  ordinance, a tenant's only cognizable defense to eviction is to prove, with evidence, that the landlord

19  actually did not have a bona fide intent to withdraw the property from the rental market, *i.e.*, because it

20  "actually intends to offer the vacated units to new tenants."  *Drouet*, 31 Cal. 4th at 597.  In moving for

21  summary judgment, a landlord may identify those portions of the record showing either that the tenant

22  failed to controvert the landlord's stated intent, or the absence of a genuine issue of material fact

23  regarding the landlord's intent to withdraw the property.  *Munguia-Brown*, 2019 WL 3779523, at *2.

24  The tenant must then "go beyond the pleadings" and point to specific evidence precluding summary

25  judgment.  *Id.* (quoting *Anderson*, 477 U.S. at 250).  Absent such evidence, the landlord "is entitled to

26  judgment as a matter of law."  *Id.* (citing *Celotex*, 477 U.S. at 323 & Fed. R. Civ. P. 56(e)(3)).

27  ///

28  ///

### 1.     Defendants Failed to Controvert Plaintiff's Bona Fide Intent

Here, as an initial matter, Defendants have failed to controvert Plaintiff's stated intention of withdrawing the Property from the rental market.  In order to do so, Defendants were required to assert, either by denial or affirmative defense, that Plaintiff does not actually intend to withdraw the Property from the rental market and "actually intends to offer the vacated units to new tenants."   *Drouet*, 31 Cal. 4th at 597.  Instead, Defendants have asserted a lack of "knowledge or information" regarding this issue. Ans. ¶ 18.  Both Defendants testified that they have no knowledge about whether OFM intends to take the Property off the market and prepare it for long-term storage.  A. Owen Tr. 139:22-140:3; B. Owen Tr. 51:7-15.  When asked to specifically state all material facts regarding Plaintiff's bona fide intent to withdraw the Property from the rental market, Defendants asserted only that Plaintiff "is retaliating against [D]efendants for complaining about conditions of the property."  Iyengar Decl., Ex. A (Defs.' Verified Resps. to Pl.'s Interrog. Nos. 4, 6).  Defendants' testimony otherwise focused only on what Defendants claimed would happen to the Property once it is mothballed.  B. Owen Tr. 60:15-25 (testifying that "once [the Property is] generally known as a 'mothballed' property," it will be "invaded by homeless people").  Defendants have failed to controvert Plaintiff's bona fide intent to withdraw the Property from the rental market.  Accordingly, and in light of Plaintiff's compliance with the rent control ordinance, Plaintiff is entitled to summary judgment on its sole claim in this action.

### 2.     The Record Contains No Evidence Disputing Plaintiff's Bona Fide Intent

Even if Defendants had controverted Plaintiff's bona fide intent to withdraw the Property from the rental market, the record in this case demonstrates an absence of any genuine issue of material fact with respect to this issue.  To the contrary, the record confirms that OFM intends only to mothball the Property, and not offer it to new tenants.  On June 1, 2018, OFM Acting Director Cliff Seagroves expressly "authorize[d] the mothballing of the Iranian Custodial Property located at 3400 Washington Street, San Francisco, California," to be undertaken by Mr. Sandelands on behalf of OFM.  Sandelands Decl., Ex. H.  The Action Memo prepared for Mr. Seagroves by Mr. Sandelands explained:

> In order to meet the Department's responsibilities under Article 45(a) of the Vienna Convention on Diplomatic Relations to respect and protect the property, as well as OFM's obligations under the Foreign Missions Act to protect and preserve, I recommend that we initiate the process of mothballing the property as OFM has done with the former Iranian Chancery located at 3003 Massachusetts Avenue NW, Washington, DC.

1    *Id.*  As Mr. Sandelands testified, the former Iranian Chancery was mothballed in 2011 and remains

2    mothballed today.  Sandelands Tr. 55:19-56:2 (testifying that "the Iranian Chancery . . . has been

3    mothballed for the last 10 years"); Compl. ¶ 19.

4           Plaintiff likewise explained in its verified response to Defendants' special interrogatories that the

5    only plan for the Property following Defendants' eviction is that "[t]he property will be mothballed."

6    Iyengar Decl., Ex. E (Pl.'s Resp. to Defs.' Special Interrog. No. 3).  As Mr. Sandelands testified, "the

7    Office of Foreign Missions intends to mothball the property as soon as possible."  Sandelands Tr. 57:15-

8    25; *see also id.* 58:1-60:2.  Mr. Sandelands also testified that it is "[a]bsolutely not" OFM's obligation to

9    get value out of the Property in the future.  *Id.*  Instead, Mr. Sandelands explained that OFM withdrew

10   the property to "increase[ ] operational effectiveness" because serving as a landlord from DC was "too

11   much work for too few people," and "the custodial property portfolio, which [the Property] falls under,

12   has increased significantly" with new Russian properties and a new Chinese property.  *Id.* 55:7-56:2.

13   Mr. Sandelands testified that OFM does not have, and has never had, any intention of re-renting the

14   property to any tenant in the future.  *Id.* 56:3-7.  For these reasons, even if Defendants had controverted

15   Plaintiff's bona fide intent to withdraw the Property from the rental market, they cannot point to any

16   evidence creating a genuine issue of material fact with respect to this issue.  Indeed, Plaintiff's reasons

17   for withdrawing the Property — reflected in its official documents and Mr. Sandelands's testimony — is

18   entitled to deference under the Foreign Missions Act.  *Bennett*, 604 F. Supp. 2d at 169 (explaining that

19   the court was "not free to second guess that Executive agency's decision making").

20          Finally, Defendants' assertion that Plaintiff was "retaliating" against them (Ans. ¶¶ 36, 38 (first

21   and third affirmative defenses)) is irrelevant because Plaintiff indisputably intended to withdraw the

22   Property from the rental market.  *See supra* Part V.B; *Drouet*, 31 Cal. 4th at 597.  Further, and in any

23   event, the record contains no evidence that Plaintiff is withdrawing the Property from the rental market

24   for any reason other than increasing operational effectiveness.

25          **C.      Plaintiff Is Immune from An Injunction Requiring the Property to Remain on the
                     Rental Market**

26

27          Pursuant to the Vienna Convention and the Foreign Missions Act, foreign mission properties

28   within the control of the Department of State are not subject to injunction.  22 U.S.C. § 4308(f).  An

injunction requiring the Property to remain on the rental market would impermissibly interfere with the United States' obligations under the Vienna Convention and implicate sensitive foreign policy and national security concerns, including by forcing American taxpayers to pay to maintain the habitability of Iran's diplomatic property. *Bennett*, 604 F. Supp. 2d at 160.  For these reasons, as a matter of law, Plaintiff is expressly immune from any injunction requiring the Property to remain on the rental market. *Id.* at 162-63.

### D. Plaintiff Is Entitled to Damages for Defendants' Unlawful Tenancy

Under California law, "[t]he remedy of unlawful detainer is designed to provide means by which the timely possession of premises which are wrongfully withheld may be secured to the person entitled thereto." *Knowles v. Robinson,* 60 Cal.2d 620, 625 (Cal. 1963).  "It is well established that losses sustained after termination of a tenancy may be recovered, and that damages awarded . . . in an unlawful detainer action for withholding possession of the property are not rent but are in fact damages." *Adler v. Elphick*, 184 Cal. App. 3d 642, 649-650 (Cal. Ct. App. 1986) (internal quotation marks and citations omitted).  This is "because the leasehold interest has ended" with the termination of tenancy. *Lehr v. Crosby*, 123 Cal. App. 3d Supp. 1, 9 (Cal. Ct. App. 1981) (internal citations and footnote omitted).  A landlord is "entitled to recover as damages the reasonable value of the use of the premises during the time of the unlawful detainer," and "rent control regulations have no application to an award of damages for unlawfully withholding property." *Knowles*, 60 Cal.2d at 625; *Adler*, 184 Cal. App. 3d at 649-50.[8] For these reasons, Plaintiff is entitled, as a matter of law, to an award of damages for Defendants' unlawful detainer in the amount of the reasonable rental value of the Property from June 19, 2019 until Plaintiff regains possession of the Property.

Further, Defendants are not entitled to any setoff from this amount.  In their answer, Defendants assert the affirmative defense of setoff against "any award to [P]laintiff" based on Plaintiff allegedly "not maintaining" the Property, "damages to personal property," and "for personal injury."  Ans. ¶ 42

---

[8] Based on these established principles, the model California civil jury instructions for an unlawful detainer action state that if the jury decides that the tenant wrongfully occupied the property, the jury "must also decide how much money will reasonably compensate" the landlord in the amount of "the reasonable rental value of the premises during the time" the tenants unlawfully occupied the property.  Judicial Council of Cal. Civ. Jury Instruction 4340.

(seventh affirmative defense).  Yet the record contains no evidence of any such damages.  Plaintiff is therefore entitled to damages for Defendants' unlawful detainer in the amount of the reasonable rental value of the Property, without any setoff from that amount.

**VII.     CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant summary judgment in its favor and deny Defendants' motion for summary judgment, declare that Defendants' tenancy at the Property terminated on June 19, 2019, eject Defendants and anyone residing with Defendants from the Property, and hold that Plaintiff is entitled to damages for Defendants' unlawful possession from June 19, 2019 until the date Plaintiff regains possession of the Property.

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

Dated: September 10, 2020          By:     */s/ Savith Iyengar*
                                                   SAVITH IYENGAR
                                                   Assistant United States Attorney
                                                   Attorneys for Plaintiff