Daniel Berko (SBN: 94912)
**LAW OFFICE OF DANIEL BERKO**
819 Eddy St
San Francisco, CA, 94109
Tel: (415) 771-6174
Fax: (415) 474-3748
Email: daniel@berkolaw.com

Attorney for Defendants,
Bruce Owen and Alexandra Owen

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES DEPARTMENT OF STATE ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> BRUCE OWEN and ALEXANDRA OWEN ) <br> ) <br> ) <br> Defendants. ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No.: 4:19-cv-04094-HSG <br><br> **DECLARATION OF BRUCE OWEN IN SUPPORT OF DEFENDANT BRUCE OWEN AND ALEXANDRA OWEN'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION OF ISSUES AND IN SUPPORT OF OPPOSITION TO PLAINTIFF THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT** <br><br> **(RE COMBINED REPLY AND OPPOSITION)** <br><br> **DATE; OCTOBER 15, 2020** |

I, BRUCE OWEN, declare and state:

1. I am one of the two defendants in this action. I make this declaration in support of our Motion for Summary Judgment or in the Alternative Partial Summary Judgment and in support of our opposition to Plaintiff THE UNITED STATES' Motion for Summary Judgment. I have personal knowledge of all of the facts stated in this declaration and could and would testify to them at trial if called as a witness.

DECLARATION OF BRUCE OWEN - 1 -

2. In 1984, I first became aware of the fact that 3400 Washington Street, San Francisco, California (hereafter "the house") was going to be up for sale or for rent.

3. My now wife and co-defendant Alexandra Owen and I had many other options to renting the premises. We were looking at other places to purchase or rent. When we first saw the house, we were shocked. It was in terrible condition. I consulted with my wife and we decided that we needed to put in too much money just to bring this rental up to livable standards. We also informed Mr. Michael Fehr, the Office of Foreign Missions ("OFM") individual with OFM with whom we had virtually all of our conversations at that time, and until well after we signed the second lease in 1987, and told him that unless they made all the necessary repairs, we would not consider renting a house in that condition.

4. Eventually, OFM agreed to and did make numerous repairs for us such as a new kitchen with high end appliances, they cleaned up the bathrooms, they refinished all the floors, painted the inside and outside of the entire house, they patched the roof, and thoroughly cleaned the house.

5. The negotiations we had with OFM were friendly both before the first lease and also up to and including signing the second (1987) lease. We came to know Mike Fehr well and had a very friendly relationship with him.

6. All negotiations for the first and second lease agreements were made with OFM through Mike Fehr and with the mutual understanding and discussions that we would ultimately like to buy the house. In the few months before the 1987 lease was signed, OFM through Mr. Fehr told us it wanted us to stay a long time and wanted a new agreement to reflect that. We told Mike Fehr that we were concerned about a long-term lease or agreement with OFM or any government agency who could conceivably use or abuse its power and try to arbitrarily break the lease or terminate our tenancy as at this stage we were raising two of our 4 children and had another one on the way and wanted a long term home to raise our family.

DECLARATION OF BRUCE OWEN - 2 -

We also knew we would need to put a lot of money ($200,000-$300,000) into the house if we were to stay, to fix up the premises. In response to our expressed concerns, OFM (through Mr. Fehr) presented us with the 1987 lease with the addendum which Mike Fehr said should cover all of our concerns. He told us that the addendum was to give us the protections we had sought if we were to enter into a new lease. The addendum added

a) First right of refusal to buy the house

b) Ten-year lease with an option to renew for another ten years

c) An agreement that the "State Department agrees to abide by the rent control ordinance;" the additional words "now in effect" I understood to mean the UNITED STATES would not come up with any grounds to evict us not in the SFRO at that time.

d) An agreement that if we exercised the ten year option in 1997, the maximum the rent could be raised was limited to the allowable amounts under the San Francisco Rent Ordinance, or may even be less by mutual agreement.

e) We wanted strong assurances that our tenancy would not end and that we would not be evicted absent a breach of the agreement by us or relations normalizing with Iran to the point they wanted to reoccupy the premises as their consulate, at which point we would be given at least a year to move out.

(The Addendum is located at Complaint, Exh. B, Doc. 1, p.11.)

7. As far as I can recall, there were no discussions about the San Francisco Rent Ordinance per se in the discussions before the addendum was produced and given to us by OFM. (My wife recalls mention of the rent ordinance, but I do not. It was not a major subject of discussion for sure, but protections for us to stay as long as we wanted were a significant point of discussion.) We were told by Mr. Fehr that a sale of the house to us was what OFM anticipated, but also told that when one deals with the government nothing comes quickly and it would take time. Mr. Fehr assured us that the only reason that we would be evicted (of course absent breaches of the agreement by us) was if Iran wanted the property back. We were fine with that.

8. After those discussions, OFM presented us with the 1987 lease that is attached to the complaint at Exhibit B, Document 1, p. 11-12. The addendum was drafted 100% by OFM.

9. Paragraphs 2 and 3 of the Addendum (both referencing the SFRO) were in the Addendum presented to us. There was never any specific discussion of that language. Based on our prior discussions with OFM referenced in Paragraph 6 above, we understood those two paragraphs to be OFM's answer to our concerns about not being evicted or having the rent raised substantially. The lease specifically stated that even if and when we exercised our option in ten years, the "rental rate" would be mutually agreed to "but not to exceed what the San Francisco Rent Control Ordinance specifies." *Id*

10. At the time, the 1987 lease was negotiated, neither I nor my wife, nor do I think OFM, had ever heard of the Ellis Act or even knew there was such a thing as the Ellis Act. Nothing about any Ellis Act was ever discussed or mentioned by anyone. In fact, until recently I was under the understanding the Ellis Act was passed after 1987, and at the earliest in the mid 1990s and very possibly after 2000. In 1987, I had no idea that the City had passed a law implementing the Ellis Act. Further, the 1987 lease reflected the already understood principle that we were protected by the San Francisco Rent Ordinance.

11. I understood that in the 1987 Lease, the UNITED STATES was limited in any ability to evict us to the just cause provisions of the San Francisco Rent ordinance. The whole point of paragraph 3 was to give us protections from evictions. The whole point and intent of paragraphs 2 and 3 was to give us at least as much protection as tenants under the SFRO. In our discussions before the addendum was presented to us, Michael Fehr made very clear that he wanted us to stay. The lease even provided for very limited rent increases for the first ten years which at the time I expected would be well below the allowable increases at that time under the SFRO.

12. Another provision of the Addendum that shows the friendly nature of the agreement is paragraph 6 where it was anticipated we would simply work out "in good faith negotiations" the cost of fixing the gardens and the grounds.

13. The UNITED STATES takes our discovery responses out of context where it argues that there was any agreement that OFM's obligations to follow the SFRO were limited to what protections were in the SFRO in 1987. This is untrue for sure. Any new "just causes" that were passed after 1987 would not be a new reason for OFM to evict us. I reaffirm my testimony at Doc 62-1 p. 37:9-38:20 (Tr. 63:9-64:9.) with one exception I note in the next paragraph. If clarification is needed, (I disagree with the "UNITED STATES's" characterization of my testimony as is) when I answered that new "requirements" would not apply, I was referring to new and different just causes to evict us (See Doc 62-1 p. 28:4-10) that Mr. Iyengar just asked about. Where Mr. Iyengar refers to "those requirements" in his question, I understood him to be asking about the just cause requirements.

14. I also need to correct one misstatement I made in the deposition. It was Mike Fehr who made the statements referred to in my deposition at Doc 62-1 p. 37:8-38:7. It is true that originally Ambassador Massey was also very friendly, but the statements I attribute to Mr. Massey were in fact made for sure by Mike Fehr. I misspoke.

15. Over time, the people we worked with at OFM changed. By 1996, Ambassador Massey, then the Program Director, informed us that OFM wanted a new lease with higher rents and no option to purchase the property. In response, I wrote him a letter on February 3, 1997 (Complaint, Doc. 1, page 14) exercising our option to renew for 10 years and reminding him that the agreement provided that our rent would remain protected "and as set forth under the San Francisco rent control ordinance." Obviously, I was referring to the then current San Francisco Rent Ordinance. OFM honored our exercise of the option.

16. We have always been excellent tenants and I doubt that in 420 (or so) rent payments due (35 years of payment until June 2019) we were late more than 2-3 times and then for very few

DECLARATION OF BRUCE OWEN - 5 -

days and for extraordinary personal reasons, like a death in the family. We raised our family of four children in the house which OFM knew as we had discussed this with people at OFM including Mike Fehr at the time we negotiated the 1987 lease. OFM did not keep its part of the bargain because it did not keep up the house and used very little of our rent money to maintain it over the last 30 years.

17. On November 30, 2017, I wrote OFM complaining about the conditions they had allowed to fester. My letter, attached hereto as Exhibit A is all true and correct and I incorporate the statements made in that letter by this reference. We heard nothing from OFM in response.

18. On or about May 21, 2018, the San Francisco Building Department cited the house based on conditions observable from the exterior. I sent that notice of violation to OFM on May 23, 2018. That letter and notice of violation is attached as Exhibit "B."

19. About a month later Matthew Sandelands came to the house with two unannounced women associates who mumbled their names and did not give me their cards. Sandelands had called me a few days to a week before June 19, 2018 and told me that he was going to come to the house to inspect it and he was "coming with his checkbook" to authorize repairs. He told me nothing about an authorization to evict us and the clear tenor of the conversation was that OFM was going to fix the property as needed. With that clear understanding, we arranged to see him at the house on June 19, 2018.

20. Mr. Sandelands lies in his declaration where he says the premises did not appear to be lived in. That statement is absurd. We had lived there, and nowhere else, for just short of 34 years when he came. (I was 80 years old at the time of the notice to terminate.) It was extremely obvious to any rational person that we were living in the house. He never said anything to the contrary during his visit, but his statement that he never saw any bedrooms is at best inaccurate if not false, as we took him through four bedrooms to show him the water damage and peeling paint and plaster.

DECLARATION OF BRUCE OWEN - 6 -

21. Sandelands' inspection began at 9am and took about 45 minutes. The inspection was terse and unfriendly and as he was leaving, and walked down 2 steps to the street, he then turned and said: "Oh, by the way, this is for you" promptly serving us with an eviction notice. There was no discussion leading up to this during his visit, he took no note of any of the damage, he photographed the exterior of the house and a couple of shots showing our personal property which he later described as "commercial property" which it clearly is not. When he gave me the notice of termination he told me that he had just been "walking over dead bodies" and he couldn't care less about us or the house. We never heard from him again.

22. I did state to Mr. Sandelands that the house would take $5 million in repairs, but I did not mean that literally and I actually had no idea what the cost of repairs would be. Further, to take the house to 2020 super luxury standards would take much more money than to simply fix the needed repairs so it was in compliance with building codes. We have now lived in the house two more years, plus, and no repairs have been made. Mr. Sandelands knows nothing about me that would justify him claiming that my statement as to the cost of repairs was a basis to evict us. I can say that because there is nothing about me or my experience that demonstrates knowledge of the cost of repairing the house more than any other adult with a vague knowledge of such things.

I declare under the penalty of perjury under the laws of the State of California and the United States that all of the foregoing is true and correct.

Executed on September 24, 2020 at San Francisco, California

BRUCE OWEN

# Exhibit A

**BRUCE STEPHENSON OWEN**
3450 SACRAMENTO STREET, SAN FRANCISCO, CA 94118
Ph: 415.567.8600; E-Mail: bruce@owenbayproperties.com

November 20, 2017

Mr. Cliff Seagroves
Acting Director
Office of Foreign Missions
2201 C Street, NW Room 2236
Washington DC
By e-mail: ofminfo@state.gov

Re: 3400 Washington Street, San Francisco

Dear Mr. Seagroves:

I believe you were with the staff that visited our house last year and, hence, became aware of the very poor condition the place has fallen into. One year and one very wet winter later we are now faced with severe deterioration which simply must be addressed by the OFM. It looks like San Francisco will have another wet winter and without getting into too much detail, the main areas that have to be immediately addressed are as follows:

- The rear windows/doors and deck on the back 2nd floor. We have suffered through serious leakage in that specific area with water draining (cascading is a better word) down into the much-used bedroom below which is located behind the kitchen. We have tented the area now to hopefully stop-gap water intrusion into the adjoining room and the one below. We had dehumidifiers working the interiors of both rooms last winter with about 3 gallons per day/room being extracted.
- The window frames on the east side of that room are now broken and must be replaced before the panes actually drop out onto the driveway two stories below.
- The small roof over the small bar closet on the 2nd floor is also leaking causing the ceiling to have collapsed.
- The small balcony on the front of the house hanging over the front door is severely water damaged and appears to be structurally unsound. Water leaks through the front of the house from this area into the two hallway closets on either side of the front door causing mold and electrical failure. Additionally the water intrusion has spread into the adjoining library I which we installed dehumidifiers last winter which extracted about 3 gallons per day.
- We are being advised by local contractors that the entire roof needs replacing before the myriad of leaks throughout the house can be addressed. Water damage in virtually every room is evident.

## BRUCE STEPHENSON OWEN
3450 SACRAMENTO STREET, SAN FRANCISCO, CA 94118
Ph: 415.567.8600; E-Mail: bruce@owenbayproperties.com

- We are advised that the stucco on the entire exterior surface of the house has completely deteriorated with paint peeling off everywhere resulting in general water leakage through these surfaces.

According to the terms of our original lease the landlord (OFM) is responsible for the structural integrity and maintenance of the house; hence, we would appreciate OFM's immediate response to this pressing matter.

Very truly yours,

CC: Andrew Zachs,

Attachments: various pictures of the damaged areas.

# Exhibit B

BRUCE STEPHENSON OWEN
3450 SACRAMENTO STREET, SAN FRANCISCO, CA 94118
Ph: 415. 567-8600; E-Mail: bruce@owenbayproperties.com

May 23, 2018

Mr. Matthew Sandelands
Program Manager
Office of Foreign Missions
2201 C Street, NW Room 2236
Washington DC 20520
By E-mail to OFM-info@state.gov with hard copy by Registered Mail

Re: 3400 Washington Street, San Francisco

Dear Mr. Sandelands:

Thank you for your phone call today and we look forward to hopefully seeing you out here soon for your personal inspection and to meeting you in person.

As discussed, I enclose an official Notice of Violation dated 21–May–18 from the Department of Building Inspection of the City of San Francisco in which the owner of this property is ordered "to remove or cover damaged paint in an approved manner to prevent a lead hazard". This should not come as any surprise to the OFM which has been aware of the seriously deteriorating condition of the premises from its personal inspection a couple of years back and specific letters and photographs sent in by us. The paint is literally peeling off the house, the roof needs replacing, and the house suffers from many leaks.

We have also advised the OFM in writing on November 20, 2017 and again on December 17, 2017, copies of which are enclosed, about serious physical problems to the structure which must be addressed. To date the OFM has ignored our request for remediation.

As the OFM is completely aware that the terms of our lease unequivocally state that it will maintain the structural and physical integrity of the house we ask that you advise us in an expeditious manner as to its plan of action. Lead based paint is a serious issue in California and this being the "progressive" city it has become please note that DBI is expecting the house to be repainted and has even scheduled a reinspection date of 27 June 2018. Obviously, a new paint job cannot be completed within such a time frame but I assume they will be looking for a firm schedule. Btw, as the OFM is aware, Alexandra is in the home construction business and is fully prepared to handle all elements of remediation work to the house on your behalf.

Very truly yours,



# DEPARTMENT OF BUILDING INSPECTION

Housing Inspection Services Division
City and County of San Francisco
1660 Mission Street 6th Floor, San Francisco, California 94103-2414
(415) 558-6220 Fax: (415) 558-6249 Email: DBIHIDComplaints@sfgov.org Website: www.sfdbi.org

## NOTICE OF VIOLATION

**COMPLAINT:** 201865152

**OWNER/AGENT:** IMPERIAL GOVERNMENT OF IRAN

**MAILING ADDRESS:** IMPERIAL GOVERNMENT OF IRAN
3400 WASHINGTON ST
SAN FRANCISCO CA
94118

**DATE:** 21-MAY-18

**LOCATION:** 3400 WASHINGTON ST

**BLOCK:** 0985   **LOT:** 004

**NOTICE TYPE:** COMPLAINT

**BUILDING TYPE:** NA   **USE TYPE:** R3

### YOU ARE HEREBY ORDERED TO COMPLY WITH THE FOLLOWING REQUIREMENTS:

| ITEM | DESCRIPTION |
|---|---|
| 1  THIS NOTICE INCLUDES VIOLATIONS FOR THE AREAS NOTED. | 3400 WASHINGTON STREET: |
| 2  REMOVE OR COVER DAMAGED PAINT IN AN APPROVED MANNER TO PREVENT A LEAD HAZARD. SEE LEAD HAZARD WARNING. (3605 SFBC, 1301 SFHC) | EXTERIOR OF BUILDING: Repair &/or repaint ALL chipping & peeling paint at all exposed surfaces of subject property in a lead safe manner. |

BEFORE work begins, you are required to post the enclosed sign which states that lead work is in-progress.

See enclosures:
Poster for Owner to display at Subject Property re: lead abatment work-in-progress.
Other fact sheets/informational brochures regarding procedures to safely abate lead paint.

NOTE:
A BUILDING PERMIT is REQUIRED (301 HC)
If any repairs to the subject property exceed (10) square feet then a builidng permit is required.

Examples of repairs that require a Building Permit include, but are not limited to the following: Replacement of doors, windows, and/or siding/exterior weatherproofing.

When all work is complete the Building Inspector must inspect & sign the final inspection/job card before the Housing Inspector can abate this violation. Please present the application & finalized job card to the Housing Inspector at reinspection.

PLEASE NOTE THAT THE BUILDING INSPECTOR IS DIFFERENT THAN THE HOUSING INSPECTOR (The Housing Inspector is the person who's name appears at the bottom of this Notice)

Please call 415.558.6096 in order to schedule an appointment with the Building Inspector before the reinspection date with the Housing Inspector (See bottom of this notice for the reinspection date)

Page 1



## DEPARTMENT OF BUILDING INSPECTION

Housing Inspection Services Division
City and County of San Francisco
1660 Mission Street 6th Floor, San Francisco, California 94103-2414
(415) 558-6220 Fax: (415) 558-6249 Email: DBIHIDComplaints@sfgov.org Website: www.sfdbi.org

### NOTICE OF VIOLATION

COMPLAINT: 201865152

3  Disturbing lead based paint can be EXTREMELY DANGEROUS to dwelling occupants and visitors, particularly to young children, pregnant women, pets, and to people performing work on the premises.
For interior or exterior paint removal : Always wet the surface, contain and properly dispose of leaded paint. If you are unsure whether the paint is leaded, you should test it prior to performing any work. If the paint is found to contain lead, you should consult with an expert about appropriate procedures. Proper containment and 3-day notification is required for exterior jobs of more than 10 sq.ft. (Sec.3423, SFBC)
Informational packets are available at (415) 558-6088.

You can contact the San Francisco Childhood Lead Poisoning Prevention Program at: (415) 252-3800 for free advice. IF YOU CAUSE LEAD DUST TO BE CREATED, YOU COULD BE LIABLE FOR ANY ILLNESS CAUSED BY THE DUST. Ordinance #446-97.

4  INSPECTOR COMMENTS

It's the Owner's responsibiltiy to meet the Inspector as scheduled on this Notice of Violation. (see reinspection date at end of this Notice):  It's the Property Owner's responsibility to be present or direct his/her representative to attend, the reinspection as scheduled on this Notice of Violation for the purpose of providing entry to the Inspector to those areas not accessed during the initial inspection as specified, and/or to provide access to all areas cited within this Notice.

If the Property Owner cannot attend the scheduled reinspection date, then it's the Owner's responsibility to secure a different inspection date and time with the Inspector, and provide all tenants with notification as required by California Civil Code Section 1954 (San Francisco Housing Code Section 303(b)), if any dwellings, apartment units or guest rooms are to be accessed during the reinspection. You can reach Insp.Coble by  phone @ 415.558.6190 or by Email at Johanna.Coble@SFGOV.org.

IMPORTANT NOTE: Please be sure to review the attached "Notice of Violation Warnings!" for information & costs associated with failure to comply with this Notice of Violation.

ALL ITEMS MUST BE COMPLETED WITHIN 30 DAYS.   REINSPECTION DATE : 27 June 2018 11:30 AM
IT IS RECOMMENDED THAT THE OWNER/OWNERS REPRESENTATIVE CONFIRM REINSPECTION DATE/TIME.
CONTACT HOUSING INSPECTOR :  Johanna Coble  AT   415-558-6190

FOR EVERY INSPECTION AFTER THE INITIAL RE-INSPECTION, A $170.00 FEE WILL BE CHARGED UNTIL THE VIOLATIONS ARE ABATED. SFBC 108.8

Page 2